IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 4, 2015

## STATE OF TENNESSEE v. TERRELL SMITH

**Appeal from the Criminal Court for Shelby County
No. 13-02217     Carolyn Wade Blackett, Judge**

---

### No. W2014-01988-CCA-R3-CD  -  Filed October 9, 2015

---

The defendant, Terrell Smith, was convicted by a Shelby County Criminal Court jury of attempted voluntary manslaughter, a Class D felony; possession of a firearm on school property, a Class E felony; and employment of a firearm during the commission of a dangerous felony, a Class C felony.  He was sentenced to an effective term of eight years in the Department of Correction.  On appeal, he argues that: (1) the trial court erred in allowing the victim to display scars from his gunshot wounds to the jury; (2) the State committed prosecutorial misconduct by introducing evidence of the defendant's prior conviction for unlawful possession of a weapon via cross-examination of his mother and the court should have, thus, declared a mistrial; and (3) the evidence is insufficient to sustain his conviction for attempted voluntary manslaughter.  After review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which ROGER A. PAGE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mitchell Wood (on appeal), Samuel Perkins and James Jones (at trial), Memphis, Tennessee, for the appellant, Terrell Smith.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Nicole Germain, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for attempted second degree murder, possession of a firearm on school property, and employing a firearm during the commission of a dangerous felony as a result of his shooting Rico Smith, the victim, on the property of a school in Memphis, Tennessee, on March 22, 2012.

## State's Proof

At trial, the victim testified that, on March 22, 2012, he picked up his brother, Willie Rubin, and Mr. Rubin's girlfriend, Ronisha Mays,[1] from school and took them to lunch at a nearby restaurant. The victim was accompanied by his wife and cousin. On the drive back to school, the victim learned that his brother and the defendant were having problems over a woman. When they got back to the school, Mr. Rubin and Ms. Mays exited the vehicle, and the victim saw Mr. Rubin "[h]a[ve] a couple words" with the defendant. A security officer broke it up. Mr. Rubin and Ms. Mays walked into the school, and the victim got out of the vehicle and approached the defendant to ask if he had a problem with the victim's brother. The victim said that he had never seen the defendant prior to that day. The defendant pulled a gun out of his pocket and said, "[Y]ou must think I won't shoot in broad daylight." The victim raised his arms, and the defendant started shooting at him. The first shot struck him in the arm. After the first shot, the victim ran toward the defendant. The defendant kept shooting, and the victim turned to run away as the defendant continued to shoot. The victim was shot twelve times, including "in the back and the butt." He showed several of his scars from the bullet wounds to the jury. The victim testified that he did not have any kind of weapon on his person.

Willie Rubin testified that, when they were driving back to the school from lunch, he received a phone call from the defendant, and Mr. Rubin "just hung up the phone." The previous day, he and the defendant talked on the phone, and the defendant told him that he was going to come to his school and shoot him. The defendant also threatened him via social media. Mr. Rubin explained that the defendant was upset with him over Ms. Mays. When they got back to school from lunch, he saw the defendant with two women across the school yard, and the defendant made a hand gesture in the shape of a gun at him. However, Mr. Rubin continued walking toward the building. He told a security officer that a threat had been made to him, and the officer walked him inside. However, he said that the defendant did not threaten him that day. A few minutes after he entered the building, he heard seven or eight gunshots. He ran back outside and saw the defendant leaving with two unknown women. Mr. Rubin said that he did not see the victim with a weapon that day. On cross-examination, Mr. Rubin testified that only the victim and his wife picked him up for lunch; the victim's cousin was not with them.

[1] The victim testified that Ronisha's last name was "Ivy," but Ronisha later testified that her last name was "Mays"; therefore, we will refer to her by the surname "Mays."

Andrew Karstaedt, a classmate of Mr. Rubin, testified that he witnessed the shooting. Mr. Karstaedt saw the defendant drive up to the school, get out of the car, and talk to an unknown male. The defendant started walking back toward his car but then started shooting at the victim. It appeared that the victim was walking back toward his vehicle when "all of a sudden he started getting shot." Mr. Karstaedt never saw the victim with a weapon, nor did he see the victim and the defendant engage in an argument. He heard approximately seven gunshots, or "[m]ore than that maybe."

Several Memphis Police Department officers were involved in the case. Lieutenant Christopher Kee was patrolling in the area when he heard three to five shots fired. He arrived to the scene approximately a minute after the shooting and saw the victim, bloody, lying in the street. He did not observe any weapons on or near the victim. Officer Nicholas Rudd was the second officer on the scene. He did not see any weapons around the victim. Officer Raymond Geronimo arrived on the scene no more than a minute and half after the shots-fired call went out. He secured the scene and separated the witnesses. He did not observe any weapon in the area where the victim had been lying. Sergeant Ron Perry reported to the scene and then later went to the hospital to speak with the victim and show him a photographic array. He also interviewed the defendant, and the defendant told him that he shot the victim in self-defense. Officer David Galloway, the crime scene investigator, recovered seven shell casings and two spent bullets from the scene. Officer Galloway also reported to the location where the defendant's getaway vehicle was located and found a handgun hidden in some bushes at that scene. The magazine of the gun had capacity for thirteen bullets, and it contained six live rounds when Officer Galloway found it.

**Defendant's Proof**

Charlene Smith, the defendant's mother, testified that the defendant started carrying a weapon after her house and car "got shot up." She said that he intended on getting a permit to carry the weapon but never got around to it because of work and school. On cross-examination, after Ms. Smith testified that the defendant was a "good boy," the State attempted to question her about the defendant's having been previously convicted of unlawfully carrying a weapon, but the court sustained the defendant's objection to the question and instructed the jury to disregard it.

Ronisha Mays testified that, at the time of the incident, she was "[k]ind of" dating the defendant, as well as Mr. Rubin. Ms. Mays recalled the events of the day of the incident and said that the group did not go get anything for lunch that day but instead parked at an apartment complex where the men smoked marijuana. While they were driving around, the defendant called her several times, but she hung up on him. Mr.

Rubin did not talk to the defendant on the phone. When they got back to the school, she saw the defendant across the school grounds, but she and Mr. Rubin continued walking into the building. The defendant was there to pick her up from school as he had been doing for some time. They did not talk to the defendant or get close to him. She did not see a security guard during her and Mr. Rubin's walk back to school from the victim's vehicle. She said that the defendant did not see her and Mr. Rubin walk into the building as his back was to them the entire time. Ms. Mays believed that she heard six gunshots.

The defendant testified that he was at the school that day to pick up Ms. Mays. He admitted that he shot the victim but said that he did so because he feared for his life. He recalled that the victim confronted him in an aggressive manner. He thought he saw that the victim had a gun and was reaching for it, so he started shooting the victim. The defendant explained that he always carried a weapon because he was afraid after being beat up and robbed several times. The defendant said that Mr. Rubin called him the day before the shooting; he did not call Mr. Rubin.

Following the conclusion of the proof, the jury convicted the defendant of attempted voluntary manslaughter, a lesser-included offense of the charged attempted second degree murder offense, as well as possession of a firearm on school property and employment of a firearm during the commission of a dangerous felony, as charged in the indictment.

## ANALYSIS

### I. Display of Scars

The defendant argues that the trial court erred in allowing the victim to display scars from his gunshot wounds to the jury, attacking the admission under Tennessee Rules of Evidence 701 and 403. He asserts that the victim's showing his scars, particularly one on his stomach, and testifying that it "was the result of a surgery performed as a result of being shot" by the defendant was improper lay witness testimony and also "caused unfair prejudice . . . which outweighed the probative value due to the fact that it was already testified to by [the victim] and no expert testified that the surgical scar was a necessary and reasonable procedure resulting from a gunshot wound." He also claims that showing the scar was cumulative to the victim's testimony.

Rule 701 of the Tennessee Rules of Evidence provides that a lay witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. Tenn. R. Evid. 701(a). Here, the victim showed his scars to the jury and explained that he had

4

surgery as a result of the gunshot wounds he had sustained. He did not testify, nor was he asked to testify, about the type of surgery performed or the specific nature of his injuries. He merely offered basic facts of which he had personal knowledge, which did not rise to the level of opinion testimony.

Tennessee Rule of Evidence 403 provides for the exclusion of evidence, even if relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" We note that the defendant did not object to the display of the victim's scars under Tennessee Rule of Evidence 403 at trial and has therefore waived this claim. Regardless, the victim's scars were relevant to the issue of whether and under what circumstances the defendant shot the victim, and displaying his wounds supplemented his testimony. It is not improper or uncommon for the State to present corroborating, if somewhat redundant, evidence in proving its case. Moreover, the record indicates that the victim's scars were healed and not "gross." We cannot conclude that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

## II. Prior Conviction

The defendant argues that the trial court erred in failing to declare a mistrial after it sustained his objection to the State's questioning of the defendant's mother on cross-examination. However, the defendant did not ask the court to declare a mistrial until his post-trial amended motion for a new trial.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. Id.

When reviewing allegations of prosecutorial misconduct, this court must review the record to determine "whether such conduct could have affected the verdict to the prejudice of the defendant." State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). "[P]rosecutorial misconduct does not amount to reversible error absent a showing

that it has affected the outcome of the case to the prejudice of the defendant." State v. Reid, 164 S.W.3d 286, 321 (Tenn. 2005). In measuring the prejudicial impact of any misconduct, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. State v. Goltz, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

The record shows that, during the State's cross-examination of the defendant's mother, the prosecutor asked if she knew how many times the defendant had been convicted for unlawfully carrying a weapon. Defense counsel immediately objected. At a bench conference, the State asserted that the defendant's mother had opened the door to such questioning by testifying that the defendant was a "good boy." The trial court disagreed and sustained the objection. The trial court then instructed the jury to disregard the question. The defendant requested no other relief. The State posits that, because the defendant did not request the extraordinary relief of a mistrial until his post-trial motion, he waived the issue.

Regardless of whether the defendant waived the issue, the alleged misconduct did not necessitate a mistrial. The State asked the defendant's mother a question concerning the defendant's character based on the reasonable, although possibly mistaken, assumption that the defendant's mother had opened the door to such questioning by testifying that the defendant had "always been . . . trying to do the right thing." The trial court sustained the defendant's objection before the witness had a chance to respond, and the trial court gave a curative instruction immediately thereafter which we presume the jury followed. See State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). Moreover, the statement had little bearing on the ultimate issue in the case of whether the defendant acted in self-defense, and there was little, if any, other improper conduct apparent in the record. The defendant is not entitled to relief.

### III.  Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that the testimony of the State's witnesses was inconsistent, and the record lacked evidence that he acted in the heat of passion.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense":

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a). The jury is responsible for reviewing the evidence to determine whether it supports a finding of adequate provocation. State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001).

In the light most favorable to the State, the evidence shows that the unarmed victim approached the defendant on the grounds of the school, inquiring whether the defendant had a problem with the victim's brother. The defendant pulled a gun out of his pocket and said, "[Y]ou must think I won't shoot in broad daylight." The victim raised his arms, and the defendant started shooting him. The jury accepted this evidence and disregarded the defendant's attempt to characterize the shooting as self-defense. With regard to the defendant's claim that the testimony of the State's witnesses was too inconsistent for a reasonable juror to have reconciled the testimony and overcome his assertion of self-defense, we note that we have thoroughly reviewed the testimony from the trial and it was not nearly as inconsistent as the defendant would suggest. Moreover, any inconsistencies in the witnesses' testimony were resolved by the jury as the trier of fact, as was its province.

With regard to the defendant's assertion that the record lacked evidence that he acted in the heat of passion, we note that the evidence shows that the victim aggressively approached and confronted the defendant about earlier threats regarding the victim's brother. According to the defendant, the victim threatened him physically. This evidence, viewed in the light most favorable to the State, is sufficient to support the jury's finding that the defendant acted in a state of passion produced by adequate provocation when he shot the victim.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE